UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| YANGTZE MEMORY TECHNOLOGIES COMPANY, LTD., <br><br> Plaintiff, <br><br> v. <br><br> MICRON TECHNOLOGY, INC.,, et al., <br><br> Defendants. | Case No. 23-cv-05792-RFL (TSH) <br><br> **DISCOVERY ORDER** <br><br> Re: Dkt. Nos. 55, 68 |

The parties have a discovery dispute over several provisions in a proposed protective order. The Court held a hearing on June 13, 2024 and now issues the following order.

**A.  One Year Versus Two Years**

The parties agree in section 8 of the proposed protective order on a prosecution and acquisition bar, but they disagree about whether the bar should last for one or two years. In its opposition brief, YMTC acknowledges that it agreed to an acquisition bar during meet and confer but spends most of its brief trying to walk back that agreement and arguing that an acquisition bar is not necessary. That is not a productive way to approach a discovery dispute.

The Court's model protective order states that a prosecution bar is optional, but the model order contemplates that if one is included, two years is the time frame. In light of that, the Court agrees with Micron that the prosecution and acquisition bar should be two years.

**B.  Source Code Must Be Made Available in the United States**

YMTC proposes to make its source code available for inspection at its headquarters in Wuhan, China. YMTC submits a declaration from Menghao Dai, which states that "[i]t is likely if not certain that many of YMTC's core technical documents cannot be exported out of China without license and/or other authorization for relevant Chinese authorities." ECF No. 65-10 ¶ 10.

1 The declaration states that the unauthorized export of YMTC's core technical documents "likely" would be prohibited by the PRC Foreign Trade Law and PRC Export Control Law. *Id*. ¶ 11. The declaration states that YMTC's core technical documents "may be" subject to the PRC State Secrets law and that YMTC "may have to" negotiate with the Ministry of Science and Technology and other relevant authorities "to identify the scope of secrecy that applies to its material and specific requirements for the treatment [of] certain classified matters, prior to being able to export them." *Id*. ¶ 13. The declaration goes to state that YMTC's core technical documents "may be" catalogued as important data under other laws and regulations. *Id*. ¶ 14. The declaration states that "[o]btaining approval and a license is uncertain and time consuming." *Id*. ¶ 16.

This declaration is noncommittal and vague. To say that it is "likely . . . that many" of YMTC's core technical documents cannot be exported without authorization is an uncertain opinion that leaves open the possibility that most or all of them could be exported without any authorization, and also seems to acknowledge that all of them could be exported if YMTC obtained authorization. The assertion that YMTC's core technical documents "may be" subject to other laws is too vague to mean anything. Finally, the declaration caveats every export restriction with an acknowledgment that if it is applicable, the export is okay if authorization is obtained. This declaration is insufficient to establish that YMTC cannot make its source code available for inspection in the United States.

At the June 13, 2024 hearing, YMTC reported that it has begun the process of seeking a determination if any of these export restrictions actually do apply to YMTC's source code, and if so, whether the relevant government authorities will grant authorization. YMTC was not able to provide the Court much in the way of detail about where this process stands, such as exactly when YMTC initiated it, though the Court was left with the impression that it was relatively recently. This incomplete information is also not enough to show that YMTC's source code cannot be made available in the United States. The Court does not have enough information to know if YMTC was diligent in initiating this process, and of course, doesn't know what the outcome will be, such as whether there may be a determination that none of the referenced laws are applicable, or that authorization is provided.

Both sides seem to agree that making the source code available for inspection in China is not a complete solution either. Micron points out that if there is an applicable export restriction, then if Micron's experts request print outs of excerpts of source code as part of their code review, YMTC would need to obtain authorization for each print out. In its sur-reply brief,[1] YMTC acknowledges the point, but argues that "the prospect of obtaining permission to export an indefinite and extensive amount of source code for production is likely to be far more difficult and time consuming than seeking permission to export the limited amount of information on which Micron will rely upon in its expert reports and at trial." ECF No. 68-2 at 3. But Micron's experts are likely to perform source code review throughout fact discovery, each time requesting more print outs of excerpts, so obtaining export permission (or a determination that none is needed) multiple times throughout discovery does not seem more efficient than obtaining it once for the whole thing.

There is also the problem of who should bear the risk of regulatory uncertainty. Clearly, YMTC should. YMTC knows what its technology is and is better positioned to work with Chinese authorities to obtain a determination about which laws may be applicable and then to obtain export authorization if needed. It is unreasonable to demand that Micron's experts go to China to inspect YMTC's source code, with no idea if this review and their related note-taking could be deemed an illegal export. Micron would not likely be able to retain any experts willing to do source code review if there is any possibility they could end up in a Chinese jail. YMTC's proposal to make its source available for review in China is therefore completely unworkable.

Accordingly, the Court **ORDERS** YMTC to make its source code available for review in the United States.

C.   **Restricting Access to Micron's Technical Information to YMTC**

The YMTC parent company is on the Entity List for Export Administration Regulations. Because of this, Micron proposes that: (1) Plaintiff's outside counsel at Ropes & Gray be prohibited from providing YMTC any legal advice regarding the substance of YMTC's patent

---

[1] The Court **GRANTS** YMTC's motion to file a sur-reply brief.

3

infringement claims, including any advice about whether the claims are strong or weak; (2) YMTC be barred from any hearing, including public hearings, in which Micron's confidential technical information will be presented or discussed, including information that is not subject to any U.S. export controls; (3) everyone at YMTC, including in-house counsel, be barred from accessing or receiving Micron's confidential technical information, including information that is not subject to any U.S. export controls; (4) a provision be added to paragraph 14.6 of the proposed protective order that if there is an accusation of an actual or potential violation of a protective order, the accused party will discontinue the challenged conduct pending a court order; (5) expert disclosures be enhanced; and (6) that section 7.4(b) of the proposed protective order be rephrased. Micron says these proposals are appropriate because the YMTC parent company is on the Entity List.

        Proposals 1, 2 and 3 are frivolous, and proposals 4, 5 and 6 have nothing to do with export control. The Court rejects them all. Arguing that Plaintiff's counsel should not be able to provide legal advice concerning the substance of Plaintiff's patent infringement claims, including their merit, is probably the most grossly overreaching discovery argument that the undersigned judge has ever seen. For proposals 2 and 3, it did not escape the Court's attention that Micron made no effort to have its proposals track any sort of legal requirements associated with export laws. For proposal 2, hearings in which Micron's confidential technical information will be discussed likely will include *Daubert* and summary judgment hearings. While the Court has discretion to seal such hearings, they are typically public hearings. Barring YMTC from attending important hearings in its own case that members of the public will likely be able to attend does not make any sense. Micron's proposal for paragraph 14.6 gives one litigant control over the other, merely by making an accusation, no matter how meritless, and without obtaining relief from the Court. The proposed enhanced expert disclosures are an unnecessary departure from the district's model order, inappropriately burdensome, and really just unexplained.[2] Finally, section 7.4(b) in the

---

[2] At the hearing, Micron argued that when experts are disclosed, their prior work related to NAND should be disclosed, and YMTC agreed. If the parties want to include such a provision in a revised proposed protective order, they may. Micron's draft language used the "technology at issue" formulation as part of a sweeping disclosure requirement that the Court rejects.

1  model order is clear as written.

2  YMTC argues that this district's model protective order already contains an optional

3  paragraph 14.3 that addresses export control. It says:

> Disclosure of Protected Material shall be subject to all applicable laws and regulations relating to the export of technical data contained in such Protected Material, including the release of such technical data to foreign persons or nationals in the United States or elsewhere. The Producing Party shall be responsible for identifying any such controlled technical data, and the Receiving Party shall take measures necessary to ensure compliance.

YMTC argues that paragraph is sufficient, with some modifications the parties have jointly made, and the Court agrees.

The Court is not conceptually opposed to adding additional protections beyond the language in model paragraph 14.3. However, the Court's job is to call balls and strikes. It is not the Court's job to do the hard work of drafting reasonable and appropriate export safeguards, especially since Micron was not interested in doing that either. Take a look at Micron's proposals and read them for yourself. They are the redlines highlighted in light blue in ECF No. 56-2. Micron really did propose that YMTC be barred from attending any hearing in which Micron's confidential technical information will be presented or discussed. This proposal wasn't limited to under seal hearings from which the public would be barred – the proposal said "any" hearing – and Micron's confidential technical information wasn't a defined term that was somehow linked to export control laws. Similarly, when Micron proposed that everyone at YMTC be barred from receiving Micron's confidential technical information, the term was again undefined, and there was no attempt to tether the scope of that ban to export controls. And Micron really did propose that:

> Ropes and any other person or entity acting on Ropes' behalf shall not communicate, in any way, with YMTC, or any subsidiary, employee, officer, director, or non- approved agent thereof, regarding the substance of any infringement claim brought against any Micron product, or on any other topic, that bears directly or qualitatively on Micron's technical information.  For example, this Stipulated Protective Order expressly precludes Ropes from indicating to YMTC that it views the infringement case against Micron on a

Accordingly, the Court does not adopt Micron's proposed language on that point.

5

particular claim to be strong or weak.

The Court does not think it would have been that hard to come up with document and communication restrictions that were tethered to the export control laws. But the Court can also see that Micron wasn't trying to do that. And if Micron wasn't interested in making any serious attempt to tether its proposed restrictions to the requirements of the export laws, the Court is not going to do Micron's work for it. Where, as here, a litigant goes to the mat with plainly unreasonable proposals, it should simply be met with rejection.

**D.    The Definition of "Technology at Issue"**

The parties propose competing definitions of "technology at issue" in section 2.24 of the proposed protective order. That term is used in three places in the proposed protective order: (1) Micron's proposed enhanced expert disclosures in sections 7.4(a) and 7.4(d) that the Court has rejected; (2) section 8 in the prosecution and acquisition bar, and (3) section 9(e) to describe the materials available on the secure computer that the reviewing party may review. The Court strikes section 2.24 from the proposed protective order and will not adopt the defined term "technology at issue."

The Court's rejection of the enhanced expert disclosures renders moot the first place this proposed term is used. Adopting the defined term "technology at issue" would cause the scope of the prosecution and acquisition bar to be related to what is available on the secure computer to review, yet those are unrelated ideas. The prosecution and acquisition bar is supposed to refer to the subject matter of the invention and of the highly confidential technical information to be produced. The "subject matter" of the invention and the highly confidential information is not narrowly limited to the existing inventions, or to what is relevant in discovery, because the prosecution and acquisition bar relates to patents for other, similar technologies. Here, Micron's proposed definition for "technology at issue" results in a prosecution and acquisition bar that applies to "semiconductor technology related to or capable of use in NAND memory or NAND memory devices," whereas YMTC's proposed definition results in a prosecution and acquisition bar that applies to "semiconductor technology used in 3D NAND memory or 3D NAND memory devices." YMTC's proposal results in a prosecution and acquisition bar that is too narrow, given

6

Micron's showing that 2D and 3D NAND are related. Accordingly, the Court concludes that the prosecution and acquisition bar should apply to semiconductor technology related to or capable of use in NAND memory or NAND memory devices.

With respect to paragraph 9(e), the parties are trying to smuggle a motion to compel into this protective order dispute. The materials that should be available to review on the secure computer are the relevant ones. If one side believes that the other has not made the relevant materials available, it should raise that as a discovery dispute. The parties should then make the normal arguments litigants make about whether something is relevant or not, which arguments they have not made yet. Showing that 2D NAND is similar to 3D NAND is a good argument for why the prosecution and acquisition bar should cover both, but it really has nothing to do with what source code should be on a review computer.

Accordingly, the Court gives the prosecution and acquisition bar the scope described above and strikes the term "technology at issue" from the proposed protective order.

**E.     Conclusion**

If this order is sufficient to enable the parties to file a stipulated protective order, they shall do so within seven days. Alternatively, within seven days they shall file competing proposed orders and a joint letter brief, not to exceed five pages, setting forth their respective views.

**IT IS SO ORDERED.**

Dated: June 14, 2024

THOMAS S. HIXSON
United States Magistrate Judge